## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RICHARD HORNSBY,**<br>P.O. Box 1631<br>Los Altos, CA 94023 ,<br><br>Plaintiff,<br><br>v.<br><br>**SANDRA L. THOMPSON**,<br>Acting Director<br>Federal Housing Finance Agency<br>400 Seventh Street, S.W.<br>Washington, DC 20219,<br><br>Defendant. | Civil Action No._____ |

## COMPLAINT
(Retaliation for Opposing Discrimination and Mixed Case Appeal )

### Introduction

1.       Plaintiff Richard Hornsby brings this action pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) and the Civil Service

Reform Act (CSRA), 5 U.S.C. § 7703(b)(2).  Plaintiff contends managers at the Federal Housing

Finance Agency unlawfully discharged him from his position as Chief Operating Officer (COO)

of the Federal Housing Finance Agency (FHFA) based on 18 allegations of conduct unbecoming

a Federal manager that were trumped up because he opposed unlawful discrimination in his

workplace at FHFA in violation of both Title VII and the CSRA. After a five-day hearing before

an Administrative Judge (AJ) of the U.S. Merit Systems Protection Board (MSPB), the AJ

reversed Plaintiff's termination finding that, although he had not proven his retaliation claim,

Defendant FHFA had failed to prove all 18 of the allegations against Plaintiff. However, FHFA

filed a petition for review and the Board[1] eventually reversed the AJ on several of the allegations

and affirmed Plaintiff's termination as well as the denial of his retaliation claim. Plaintiff

contends that this action by the Board was arbitrary, capricious, an abuse of discretion,

unsupported by substantial record evidence and/or contrary to governing law and regulation.

Plaintiff further contends that both the AJ and the Board violated the governing statute by failing

to provide him interim relief during the time between the AJ's order reinstating him and the

Board's ruling on FHFA'S Petition for Review as required by law. 5 U.S.C. § 7701(b)(2)(A)

(Providing that interim relief "shall be granted the relief provided in the decision effective upon

the making of the decision, and remaining in effect pending the outcome of any petition for

review under subsection.") Plaintiff therefore requests that, *inter alia*, the Court order Defendant

to immediately provide Plaintiff interim relief as required by statute, retroactively reinstate him

in his COO position with full backpay and associated benefits, and award Plaintiff with such

compensatory damages as may be determined by a jury.

**JURISDICTION**

2.      This Court has jurisdiction over the subject matter of this civil action pursuant to

Title VII of the Civil Rights Act of 1964, as amended  as amended by the Equal Employment

Opportunity Act of 1972, 42 U.S.C. § 2000e-16(c) and by the Civil Rights Act of 1991, 42

U.S.C. § 1981a. and the Civil Service Reform Act, 5 U.S.C. § 7703(b)(2).  Plaintiff has

---

[1] To avoid confusion, Plaintiff refers to the Administrative Judge as the "AJ", and for actions
taken by the Board members of the MSPB in connection with the Agency Petition for Review as
the "Board."

exhausted his administrative remedies by filing a mixed case appeal with the MSPB and having received a decision denying his appeal on April 28, 2022.

### Venue

3.      Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) as the events giving rise to Plaintiff's claims occurred in this judicial district, the personnel records of Defendant concerning Plaintiff are here, and the Defendant is located, has offices, and conducts business in this judicial district.

### Parties

4.      Plaintiff Richard Hornsby is a citizen of the United States and a resident of the State of California.  Until he was involuntarily terminated by the FHFA on March 21, 2015, Mr. Hornsby was the agency's Chief Operating Officer, since December 6, 2011, though he was on forced excused absence (and barred from FHFA's facilities) from April 28, 2014.

5.      Defendant Sandra L. Thompson is the Acting Director of the Federal Housing Finance Agency ("FHFA"), and as such is the head of the FHFA, which is an independent agency within the Executive branch of the government of the United States, and which has employed at least 600 persons in each of the last 20 months.  Ms. Thompson  is here named as defendant in only her official capacity as head of the FHFA.

## Statement of Facts

6.       Richard  Hornsby is a financial executive of long experience.  He graduated from

Utah State University in 1981 with a Bachelor of Science degree in Business Administration

(Finance) and received a Masters in Business Administration (MBA) from the same university in

1989.

7.       After working as a commercial loan officer with First Security Bank for three

years following graduation from college, in October of 1984, Mr. Hornsby joined the staff of the

Federal Reserve Bank of San Francisco.  He served the Federal Reserve Bank for more than 25

years in positions of ever increasing authority and importance, retiring in December 2010 as a

group Vice President for Corporate Financial Planning and Control.

8.       In 2011, Mr. Hornsby was selected to fill the position of Chief Operating Officer

(COO) of the FHFA,  a job being vacated by Edward DeMarco when he became the acting

Director of the FHFA.  Mr. Hornsby He entered on duty on December 5, 2011.

9.       For the most part, Mr. Hornsby got on well as the COO of the FHFA, both with

his executive peers at the agency and his subordinates in the units of the FHFA that reported to

him.  He also got along well with his supervisor, Ed DeMarco, the acting Director of the Agency

and his predecessor as the agency's COO.  In fact, for 2012, Mr. Hornsby's first full year as

COO at the FHFA, DeMarco rated him "Outstanding" and gave him a bonus of over $17,500.00.

In addition, DeMarco authorized a retention allowance for Mr. Hornsby of over $25,000 per year

to help defray the costs of his maintaining a residence in Washington (in addition to his home in

California) and frequently traveling back to California to see his wife.

10.       However, in April 2014, Mr. Hornsby became involved in a discrimination

complaint brought by Marie Harte, the Deputy Director of the FHFA Office of Human

-4-

Resources Management (HR), wherein Ms. Harte contended her supervisor, HR Director Jeffrey

Risinger, had reorganized the office to minimize her duties as an act of retaliation against her

because she had, against Mr. Risinger's wishes, brought a sexual harassment claim on behalf of

one of her female subordinates.

11.     Prior to April 2014, Mr. Hornsby had a close and friendly relationship with Mr.

Risinger. Mr. Hornsby had given him an outstanding performance review rating for 2013

because he had initially believed Mr. Risinger's representations that Ms. Harte had fully

supported the reorganization and that her new role after reorganization was her "dream job."

12.     However, on April 25, 2014, Mr. Hornsby attended a mediation of Ms. Harte's

EEO retaliation claim, and for the first time, heard her describe: (a) her situation in HR and her

position on the effect of Risinger's 2013 reorganization; (b) the EEO activity on her part that

brought on this retaliation; and (c) Risinger's dogged resistance to effecting the triage plan

(which would have her returned to a prominent role in HR). Mr. Hornsby attended that

mediation as the FHFA's settlement officer for EEO and other personnel claims, and he agreed

to settle Ms. Harte's EEO claims against Mr. Risinger on behalf of the FHFA and afforded Ms.

Harte some relief based upon her allegations.

13.     On the afternoon/evening of Friday, April 25, 2014, Mr. Risinger learned that Mr.

Hornsby had agreed to settle Ms. Harte's EEO retaliation claims in which Risinger was the

alleged retaliator (which settlement included both Ms. Harte receiving a review of her

performance and the initiation of the triage plan).

14.     Mr. Risinger, who was increasingly worried about Mr. Hornsby's view of him

and his performance as head of HR, invented a story that Mr. Hornsby had confided a threat to

do bodily harm to Edward DeMarco, who was shortly to depart the agency's employ at the end

of that month, because of his purported "rage" over the "Fully Successful" rating for 2013 and its effect of eliminating the possibility of cash bonus. This story was pure invention on Risinger's part as Mr. Hornsby never uttered any such threats.

15.     On the Monday following the mediation, April 28, 2014, Mr. Risinger "reported" to the FHFA's lawyers and then to agents of its Office of Inspector General the alleged threats against DeMarco life and physical well being that he claimed Mr. Hornsby had made.

16.     This completely false claim by Risinger – that Mr. Hornsby had uttered threats to kill or do physical injury to Edward DeMarco – resulted in Mr. Hornsby's being escorted from the agency facilities and placed on excused absence status on Monday, April 28, 2014, without him even being told of the actual allegations

17.     The next day, April 29, 2014, agents of the FHFA's Office of Inspector General ("OIG") called on Mr. Hornsby at his residence and, after they advised him of his rights (*e.g.*, to remain silent, etc.), he waived those rights and answered the OIG agents' questions, making a full statement in which he unequivocally and absolutely denied making any threats against the life or physical well being of Edward DeMarco.

18.     On April 30, 2014, at approximately 10:30 p.m., armed agents of FHFA's Inspector General's office, in assault gear, came to Mr. Hornsby's residence and placed him under arrest on three felony charges, all based on the uncorroborated claims of Jeffrey Risinger, having to do with attempting to kidnaping, murder, and doing bodily harm to Edward DeMarco – claims that Mr. Hornsby had plainly and clearly denied the previous day to OIG agents after waiving his right to remain silent. Mr. Hornsby was removed from his residence by the armed OIG agents and taken to the D.C. lock-up, where, due to the lateness of the hour, he remained overnight.  It was not until mid-afternoon on the day following his arrest by FHFA OIG agents

that Mr. Hornsby was released after pleading not guilty to the three felony charges at a judicial hearing; but nevertheless he was required to report weekly to the pretrial services during his release.

19.     At the same time, some "senior official of the FHFA" leaked the news of Mr. Hornsby's arrest to the Washington Post, the Wall Street Journal, and Bloomberg Business News, thereby further humiliating Mr. Hornsby.

20.     No gand jury was ever convened. Instead, the U.S. Attorney's office reduced the charges against Mr. Hornsby to two misdemeanors so as to negate Mr. Hornsby's right to trial by jury.  As trial approached on these misdemeanor charges, without any warning, FHFA Director Melvin Watt proposed that Mr. Hornsby be placed on "indefinite suspension" until the criminal charges had been resolved, which would have stripped Mr. Hornsby of his salary with the trial still about a month away.  Due to a procedural defect pointed out by Mr. Hornsby's employment counsel – Watt was the proposing official, but he had appointed a subordinate as the deciding official, thereby bringing into question the unbiased nature of the decisional process – this proposed adverse action was never acted upon, but was left dangling over Mr. Hornsby's head thereafter.

21.     On November 18 and 19, 2014, a bench trial was held on the misdemeanor charges against Mr. Hornsby before the Honorable Juliet J. McKenna, Associate Judge, Superior Court of the District of Columbia.  On November 20, 2014, Judge McKenna found Mr. Hornsby not guilty of all charges and dismissed the case. In rendering her decision from the bench, Judge McKenna of course stated that the government had failed to meet its burden "beyond a reasonable doubt" – the burden of proof in criminal cases – but she went on to explain how she came to conclude the government had failed to meet its burden of proof.  In doing so, Judge

McKenna described on the record, at length and in detail, how and why she had come to the conclusion that: (a) Jeffrey Risinger, the only witness to the threats allegedly made against Edward DeMarco by Richard Hornsby, was not in the least credible in his assertion that threats had been uttered by Mr. Hornsby; and (b) Risinger had a motive to fabricate the entire account.

22.     Having been exonerated by Judge McKenna's ruling, Mr. Hornsby expected to be returned to duty in his COO position at the FHFA, particularly since the COO position at the agency had not been filed on a permanent basis, and, like Edward DeMarco, Jeffrey Risinger and the acting Inspector General at the end of April 2014 who had ordered Mr. Hornsby's arrest, had departed the FHFA's employ. However, FHFA Director Melvin Watt who months previously had threatened that if Mr. Hornsby did not resign, stating that he would fire him no matter the outcome of the criminal proceedings, refused to return Mr. Hornsby to duty at FHFA in any capacity.

23.     On December 19, 2014, Mr. Watt issued a proposal to terminate Mr. Hornsby from his position with FHFA and from the federal service for misconduct – *i.e.*, conduct unbecoming a federal management official.

24.     The lead allegations of misconduct are the claims that Mr. Hornsby threatened violence and death on the then former Director of FHFA, Edward DeMarco – claims which were made only by Jeffrey Risinger, whose testimony had been specifically found to be incredible with regard to those claims by both judges before whom he had testified.

25.     In addition, operatives of the FHFA's Office of General Counsel and OIG collected allegations involving individual statements Mr. Hornsby allegedly made over his last two years serving as COO at the FHFA, almost all of which allegations were untrue and/or

twisted out of context. In where the allegation was true (using a profanity), he had apologized immediately after he uttered the profane word.

26.     On March 19, 2015, FHFA Director Melvin Watt issued a decision on his proposal to remove Mr. Hornsby from his position as COO of the agency, and from the federal service, effective on March 21, 2015.

27.     Mr. Hornsby timely appealed this adverse action to the MSPB as a mixed case (i.e., both as a violation of civil service law, rules or regulations *and* as an act of unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended).  Mr. Hornsby's appeal challenged his removal on the substantive merits and also raised an affirmative defense of retaliation for his prior EEO activity, where he participated in the settlement of an HR employee's EEO complaint against Mr. Risinger while serving in the capacity as the agency's EEO settlement officer.

28.     Following a 5-day hearing, on July 14, 2016, an AJ of the MSPB issued an Initial Decision that reversed the Mr. Hornsby's removal, finding that the agency failed to prove any of the 18 specifications supporting the charge. The AJ addressed a charge conduct unbecoming a federal manager consisting of 18 specifications. The AJ found that the FHFA had failed to prove the conduct alleged in specifications 1-4 and 12-17. The AJ also found that FHFA had failed to prove that the conduct described specifications 5-11 and 18 had amounted to conduct unbecoming a federal manager. The AJ also concluded that Mr. Hornsby had not proven his retaliation claim. Based on these findings the AJ reversed Mr. Hornsby 's termination and, among other things, ordered that Mr. Hornsby be retroactively restored to duty.

29.     The AJ 's Initial Decision did not address the issue of interim relief as required by the governing regulation. *See* 5 C.F.R. § 1201.111(b)(4) (stating that, if the appellant (in this case Mr. Hornsby) is the prevailing party, the initial decision shall contain a statement as to whether interim relief is provided). As a result, in violation of the CSRA, Mr. Hornsby did not receive interim relief (*i.e.* the continuation of his pay) during the time between his reinstatement by the AJ and the Board's ruling on the FHFA's Petition for Review despite, under the circumstances, being required by statute. 5 U.S.C. § 7701(b)(2)(A) (providing that as a "prevailing party in an appeal under this subsection, the employee or applicant shall be granted the relief provided in the decision effective upon the making of the decision, and remaining in effect pending the outcome of any petition for review under subsection (e)").

30.     On August 25, 2016, FHFA filed a Petition for Review of the AJ's Initial Decision with the MSPB asserting: (a) that the 18 findings the AJ had made that FHFA had not proved a specification should be reversed; and (b) that all charges and specifications be upheld and, thereupon, Mr. Hornsby's removal be upheld. Because the AJ had failed to address the Interim Relief, Mr. Hornsby continued in a non-pay status during the time the FHFA Petition or Review was pending before the MSPB.

31.     Due to a lack of quorum at the MSPB, the Board did not issue final decisions on petitions for review between January 7, 2017, and March 3, 2022. As a result of the AJ 's failure to address Interim Relief, Mr. Hornsby remained in a not-pay status while FHFA Petition or Review was pending before the MSPB from April 25. 2016, until April 28, 2022, in violation of 5 U.S.C. § 7701(b)(2)(A) .

32.     On April 28, 2022, the Board issued a Final Order reversing the AJ's Initial Decision and ordering Mr. Hornsby's termination be reinstated, and affirming the AJ's

determination that Mr. Hornsby had not proven the affirmative defense that his removal was the productive of unlawful retaliation based upon his participation in EEO activity.

33.    The agency's allegations as referenced above were numbered as Specifications 1 through 18. (*See* Paragraphs, 1, 29, and 30 *supra*.)

34.    **Specifications 1-4.** These specifications, which had been the basis for later-discredited criminal charges that Mr. Hornsby had threatened to kill or do bodily harm to Mr. DeMarco, were the most serious charges against Mr. Hornsby. The specifications depended entirely on the testimony of HR Director Jeffrey Risinger. In assessing the relative credibility of Mr. Hornsby and Mr. Risinger, the AJ observed that Mr. Hornsby had tried and failed to incriminate Mr. Hornsby in surreptitiously recorded telephone calls that Mr. Risinger had placed on April 28 and 29, 2014, for the purpose of eliciting Mr. Hornsby's admission that he made statements about harming Mr. DeMarco. The AJ observed that, instead of directly confronting Mr. Hornsby about his alleged statements concerning Mr. DeMarco as OIG had instructed him to do, Mr. Risinger told Mr. Hornsby the investigators had questioned him about comments that Mr. Hornsby had made to him about how Mr. Hornsby would "take out" Mr. DeMarco. The AJ noted that, in surreptitiously recorded telephone calls, Mr. Hornsby denied having made the comments. The AJ also noted that Mr. Risinger had cut Mr. Hornsby off while he appeared to be denying the alleged misconduct. As the AJ 's credibility determinations regarding Mr. Risinger are consistent with those that Superior Court Judge McKenna had made in Mr. Hornsby's criminal trial, and given Risinger's delay in reporting Mr. Hornsby's purported statements. The Board upheld AJ's determinations that the FHFA had failed to prove these most important specifications 1-4.

-11-

35. **Specifications 5 and 6** involved comments that Mr. Hornsby made about EEO complaints during meetings with various agency officials in nearly three years earlier in 2012. In specification 5, the agency alleged that in late August or early September of 2012, Mr. Hornsby told the agency's EEO and Diversity Director and an EEO Counselor that he did not believe any of the complaints about the HR Deputy Director Risinger, and that if there were any more complaints about her, there would be "serious consequences," or words to that effect. However, FHFA had failed to impose discipline on Mr. Hornsby when the remarks were made in 2012, or to take the remedial step of advising Mr. Hornsby of the legal and policy importance of allowing employees to file anonymous internal complaints. In Specification 6, the agency alleged Mr. Hornsby told a group of agency employees, including the EEO Director, the HR Director, the HR Deputy Director, and agency attorneys, that employees should not be allowed to make anonymous EEO complaints and that EEO complainants should have more "skin in the game." However, notes from the meeting appear to show that Mr. Hornsby's remarks followed the EEO Director describing in the meeting how resolving EEO complaints is more difficult when the complainants are anonymous. The Board found that Mr. Hornsby's sharing his opinion on this matter did not necessarily seem out of place. As such, the Board affirmed the AJ's findings that the agency failed to prove specifications 5 and 6.

36. **Specification 7.** In specification 7, the agency alleged that, during an April 22, 2013 meeting with a Senior Economist who had sent Mr. Hornsby an email seeking clarification about pay raises, Mr. Hornsby held up a copy of the email and said, "[L]ooking at this email . . . I found it [expletive] offensive." The agency further stated that when the Senior Economist responded by saying that he had to leave because Mr. Hornsby had just cursed at him, Mr. Hornsby apologized, and the employee stayed. In finding that the agency failed to prove this

-12-

specification, the AJ reasoned as follows: "Most adults curse at least occasionally and [F]ederal

managers are adults." The AJ found that "a single instance of uttering the word '[expletive]' in

this context, especially if one apologizes afterward, is not conduct unbecoming a [F]ederal

manager." Substituting its Judgment for that of the AJ , the Board found that because Mr.

Hornsby was a supervisor, he should be held to a higher standard to set an example for other

employees to follow and found the agency had proved specification 7 of the charge. The Board,

however, also found that specification 7 did not warrant severe disciplinary action.

37.    **Specification 8.** In specification 8, the agency alleged that on three occasions,

Mr. Hornsby made remarks about specific employees in inappropriate settings and/or in the

presence of employees who should not have heard these comments. The AJ found that "while

criticizing one employee in front of others is not a management best practice, under the

circumstances described in the record it is not conduct unbecoming a federal manager." With

regard to the first two statements, the Board upheld the AJ noting that Mr. Hornsby was

referring to the allegations in a grievance against the agency's Chief Information Officer (CIO),

who reported directly to Mr. Hornsby and that Mr. Hornsby had not engaged in conduct

unbecoming either by stating that the CIO should be put on a PIP or if her allegations were true,

the issue would be reflected in the CIO's performance evaluation. However, the Board held that

Mr. Hornsby had engaged in unbecoming conduct when he told the other manager that a specific

employee had filed an EEO complaint because he could have made the same point without

revealing the name of an EEO complainant. As with specification 7, the Board found that

specification 8 did not warrant severe disciplinary action.

38.     **Specification 9.** In specification 9, the agency alleged that Mr. Hornsby had

became agitated during a meeting. The AJ found"becoming agitated" is not conduct unbecoming

a Federal manager and the Board upheld that finding.

39.     **Specification 10.**  In specification 10, the agency asserted that during a February

20, 2014 meeting, Mr. Hornsby placed his hand over the mouth of a colleague to prevent him

from making further comments. The AJ  noted that neither Mr. Hornsby nor the colleague

remembered Mr. Hornsby engaging in any such conduct but concluded that the alleged conduct

likely occurred, but it probably was not a "big deal" given the colleague's own testimony that he

"tends to need to be silenced" and that Mr. Hornsby was his friend. As such, the AJ  found that,

under these circumstances, Mr. Hornsby's conduct was not unbecoming. Without addressing the

finding that the incident was not a big deal, the Board overruled the AJ and instead found the

agency proved this specification. However, the Board also found that specification 10 did not

warrant severe disciplinary action.

40.     **Specification 11.** In Specification 11, FHFA alleged that Mr. Hornsby engaged in

conduct unbecoming by telling the attorneys that issuing the memorandum might be a "career

ender." The memorandum, which involved a public survey to gather mortgage lending

information, was going through a clearance process before it was released to the public. From

December 2013 until March 31, 2014, emails were exchanged among the Research Economists,

the General Counsel, the FHFA Director Mel Watt and Mr. Hornsby to clarify facts and assess

risks of the public survey process. Mr. Hornsby saved FHFA $100,000 in late charges by

ensuring that the March 31, 2014 deadline for submission of the memorandum was met and that

ensured that FHFA had lived up to its $1.5 million contract with the other federal regulator, the

Consumer Finance Protection Bureau (CFPB). Mr. Hornsby testified he was referring to his own

-14-

career when he used the term "career ender." The AJ credited Mr. Hornsby's testimony and found that telling a staff attorney that the contents of a memorandum could end a career was not conduct unbecoming a Federal manager. However, the Board ruled that "[R]egardless of whose career might be allegedly ended by the inclusion in the memorandum of the information in question, it is understandable that the attorneys felt intimidated into removing the information," because the attorneys had already revised the memorandum several times, the attorneys' allegations that the "career ender" comment was intimidating them was credible, and thereupon the Board overruled the AJ and sustained Specification 11.

41.     **Specifications 12-17.** The AJ ruled that FHFA had not proven Specifications 12-17 and the Board upheld that ruling. The charges are based solely upon testimony of Mr. Risinger.

(a) **Specification 12** alleged conduct unbecoming when Mr. Hornsby could not hire someone he wanted or an HR employee would complain to the Inspector General or Mr. DeMarco about the HR Deputy Director Risinger, and that he told the HR Director that he would outsource the HR function.

(b) **Specification 13** alleged conduct unbecoming when the Manager of Contracting Operations(MCO) complained to Mr. Hornsby about outsourcing contract services involving information technology to the Department of the Interior's Business Center, Mr. Hornsby told the HR Director Risinger that he would outsource the MCO's office if the MCO did not stop complaining.

(c) **Specification 14** alleged conduct unbecoming when Mr. Hornsby told the HR Director Risinger that he wanted an HR employee fired because Mr. Hornsby saw her having

breakfast with Mr. DeMarco, although he had previously spoken to the HR Director about converting that employee to a permanent appointment because of her success with the agency's recruiting program.

(d) **Specification 15** alleged conduct unbecoming when Mr. Hornsby told the HR Director, "I can't wait until the 30th when the Pope [referring to Mr. DeMarco] leaves the building."

(e) **Specification 16** alleged conduct unbecoming when Mr. Hornsby lost his composure during an meeting with various agency officials and expressed his desire to fire anyone who had complained about him.

(f) **Specification 17** alleged conduct unbecoming when Mr. Hornsby repeatedly expressed his hatred of Mr. DeMarco on multiple occasions, including April 22, 2014, when he told the HR Director Risinger in a very serious tone that he wanted to jump out of his window or blow his brains out. The Board rejected FHFA's appeal and upheld the Administration Judge's determination that the Agency had failed to prove these specifications.

42. **Specification 18.** In specification 18, the agency alleged Mr. Hornsby was unprofessional when after he became aware of his "Fully Successful" performance rating, he asked the HR Director Risinger to negotiate with Mr. DeMarco on his behalf for a higher evaluation that would entitle Mr. Hornsby to a bonus. Actually, Mr. Hornsby sent an email to HR Director Risinger asking him to make sure that Mr. DeMarco did not give him a partial bonus. Mr. Hornsby insisted he receive no bonus at all so as to accord with the (unfair) rating he had received from Mr. DeMarco. The AJ found Mr. Risinger had testified that he "volunteered" to approach Mr. DeMarco. While the word "volunteered" did not appear in Mr. Risinger's testimony, Mr. Risinger did testify that although the request was unusual and a "bit awkward,"

that because at the time he had a close relationship with Mr. Hornsby he "wanted to try and find a way to accommodate what he had asked me to do." The AJ found that "nothing about the contents of the email was unattractive or unsuitable, detracted from his character or reputation, or created an unfavorable impression" and thereupon determined that FHFA had failed to prove Specification 18. The Board found that the record did not support the AJ's finding that Mr. Risinger had not testified that he "volunteered" to raise Mr. Hornsby's evaluation with Mr. DeMarco. The Board then concluded that Mr. Hornsby had improperly asked Mr. Risinger to negotiate with Mr. DeMarco to raise his evaluation so that he could receive a bonus. In addition the Board disagreed with the AJ's finding that there was nothing unsuitable about Mr. Hornsby's email to the HR Director because Mr. Hornsby had made disparaging remarks about Mr. DeMarco in the email to his friend at the time Mr. Risinger. The Board therefore overruled the AJ and found that the agency had proved specification 18.

43.     In sum, the Board found no basis for disturbing the AJ's findings that FHFA had failed to prove specifications 1-6, 9, and 12-17, and two parts of specification 8, but that FHFA had proved specifications 7, 10, 11, and 18, and one part of specification 8. Based upon these findings the Board sustained the charge of conduct unbecoming a federal management official and upheld FHFA's termination of Mr. Hornsby's employment.

## Statement of Claims

## Count I - Retaliation for Protected EEO Activity

44.     Defendant retaliated against Mr. Hornsby when it terminated his employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and the Civil Service Reform Act, 5 U.S.C. § 2302(b) (Prohibited Personnel Practices).

45.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer economic losses, lost pay and benefits, lost career benefits and lost career opportunities, damage in the form of emotional distress, pain and suffering, as well as personal and professional humiliation and career damage.

**Court II-Denial of Interim Relief.**

46.     The failure of both the AJ and the Board to provide Mr. Hornsby interim relief during the time the Petition for Review was pending violated 5 U.S.C. § 7701(b)(2)(A) which provides that under the circumstances as a prevailing party in the AJ hearing (pursuant to 5 U.S.C. § 7701(b)) he "shall be granted the relief provided in the decision effective upon the making of the decision, and remaining in effect pending the outcome of any petition for review under subsection (e)").

47.     As a result of this violation, Plaintiff was denied the pay and related benefits due him during the period from January 7, 2017, and March 3, 2022 while his case was pending before the MSBP on FHFA's Petition for Review.

**Count III  - Mixed-Case Review Appeal.**

48.     The Board's decision overturning the decision of the Administration Judge and affirming Mr. Hornsby's termination was arbitrary, capricious, an abuse of discretion, unsupported by substantial record evidence and/or contrary to governing law and regulation. *See* 5 U.S.C. § 7703(c).

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiff prays that this Court enter judgment in his favor and against Defendant on all claims brought herein and provide him with the following relief:

-18-

     (a)     order Defendant to provide Plaintiff with interim relief for the period from the date of the AJ's reversal of his termination on July 14, 2015, until the date of the Board's ruling on that petition on April 28, 2022;

     (b)     order Defendant to retroactively reinstate Plaintiff to the COO position effective March 21, 2015, with full backpay and related benefits plus interest thereon;

     (c)     order Defendant to provide Plaintiff with outstanding performance ratings for 2014, 2015 and every period thereafter, with bonus and pay increases earned thereby to be paid with interest;

     (d)     order Defendant to credit all annual leave and sick leave that Plaintiff would have earned but for his unlawful termination;

     (e)     enjoin Defendant and its officers and directors from retaliating against Plaintiff further;

     (f)     award Plaintiff the costs of bringing and maintaining this civil action and the administrative complaints that necessarily preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. 2000e-5(k); and

     (g)     award Plaintiff such other and further relief as the interests of justice may require.

### **Jury Demand**

Plaintiff hereby requests a trial by jury on all issues of fact, including but not limited to the measure of damages.

Respectfully submitted,

Richard L. Swick
D.C. Bar No. 936960
David H. Shapiro
D.C. Bar No. 961326
SWICK & SHAPIRO, P.C.
1101 15th Street, N.W.
Suite 205
Washington, DC 20005
Tel (202) 842-0300
Fax (202) 842-1418
Email - rlswick@swickandshapiro.com
         dhshapiro@swickandshapiro.com

Attorneys for Plaintiff